**FILED**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

*1:36 pm, 6/20/25*

**Margaret Botkins
Clerk of Court**

_____

| | |
|---|---|
| THE TRIAL LAWYERS COLLEGE, a nonprofit corporation, | |
|       Plaintiff and Counterclaim Defendant, | |
| vs. | Case Number: 1:20-CV-00080-JMC-GJF |
| GERRY SPENCES TRIAL LAWYERS COLLEGE AT THUNDERHEAD RANCH, a nonprofit corporation, and GERALD L. SPENCE, JOHN ZELBST, REX PARRIS, JOSEPH H. LOW, KENT SPENCE, and DANIEL AMBROSE, individuals, and GERRY SPENCE METHOD AT THUNDERHEAD RANCH, INC., a nonprofit corporation, | |
|       Defendants, | |
| and JOHN JOYCE, | |
|       Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff, | |
| vs. | |
| F WARRIORS, | |
|       Third-Party Defendant. | |

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR CONTEMPT [ECF 596] AND PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT [ECF 603]**

THIS MATTER is before the Court on Defendants' Motion for Contempt [ECF 596] and

TLC's Motion to Enforce Settlement Agreement ("Motion to Enforce") [ECF 603].[1]  Both motions arose *more than two years* after the parties settled the long-running and hot-blooded family feud that ignited over their conflicting visions of the direction of The Trial Lawyers College.[2]  In short, each side accuses the other of violating their Settlement Agreement and/or the Consent Permanent Injunction insofar as these documents relate to the return of TLC's physical property and the ongoing display on TLC's social media of the names or photographs of Defendants, their family members, or TLC's former home at Thunderhead Ranch.

Both Motions are fully briefed.  *See* ECFs 599, 606 (TLC's response and Defendants' reply, respectively, to Defendants' Motion for Contempt) and ECF 607 (Defendants' response to TLC's Motion to Enforce).  Besides considering each of the declarations and exhibits the parties attached to their briefing, the Court also held a lengthy evidentiary hearing at which the Court admitted four additional exhibits and heard testimony from Defendant John Zelbst, current TLC President Maren Chaloupka, and TLC President Emeritus and current Director John Sloan.  The Court delayed filing this Report and Recommendation with the hope that the parties could resolve without further judicial action the rather picayune disputes that gave rise to the Motions.  Now more than five months later, however, the Court's hope has given way to reality as the Motions remain pending.

---

[1] While Defendant John Joyce joined in Defendants' Motion, Defendant Daniel Ambrose did not.  ECF 596 at 2. Although Plaintiff's Motion does not specify the defendants as to whom it is brought, the evidentiary hearing made clear that the Motion does not implicate Defendants Joyce or Ambrose.  Regardless of whether Defendant Joyce is involved in one or both motions at issue here, the Court intends to include him in all references to "Defendants" herein.

[2] At the outset of the hearing, the Court remarked: "Just about the last thing I wanted to do in my life was referee another skirmish in this case.  I am in my 60th year, and I know I've been more disappointed in my life, but I'm virtually certain that I've not been more disappointed in the nine years that I've been doing this.  I can't – I can't express properly the disappointment I feel *that Dracula is again sitting up in his coffin*."  Tr. at 6 (emphasis added). The parties' inability to resolve their disputes in the five months since the hearing is equally disappointing.  With apologies to Prime Minister Churchill, this has not been the finest hour for the parties to this litigation.

Based on the proposed findings of fact and conclusions of law that follow, the Court recommends that the presiding judge: (1) GRANT Defendants' Motion for Contempt to the extent that it requests (i) a finding that TLC has violated the Injunction and (ii) an order that TLC sanitize its Facebook page and Twitter/X account of material barred by the Injunction; (2) DENY the Motion for Contempt to the extent that it requests the award of compensatory damages; (3) GRANT TLC's Motion to Enforce to the extent that it requests (i) a finding that Defendants have violated the Settlement Agreement by not timely returning to TLC certain items of personal property referenced in the Agreement and (ii) an order compelling Defendants to return to TLC the property in question; and (4) DENY the parties' competing requests for attorney's fees.

## PROPOSED FINDINGS OF FACT

1.    On October 12, 2022, during the second day of trial, the parties reached a settlement of all claims.[3]   ECF 586.

2.    The parties memorialized their settlement in a "Settlement Agreement" that – apart from the signatures – occupied only a single page.   *See* ECF 603-2, Mot. to Enforce, Ex. A (filed under seal).

3.    The parties also agreed to the terms of a mutual permanent injunction that they presented to the presiding judge for his consideration.   The presiding judge signed and filed the parties' two-page "Consent Permanent Injunction" ("Injunction").   *See* ECF 588.

4.    In total, the parties spent less than two hours drafting and finalizing the Settlement Agreement and Injunction.   Tr. of Evid. Hrg. ("Tr. at __") at 148:14-25.   Neither document is a model of careful drafting or terminological exactitude.

5.    In pertinent part, the Injunction forbade TLC "from using the name, image, or

---

[3] TLC settled its claims against Defendant Ambrose before trial.

likeness of Defendants Gerry Spence, Joey Low, Kent Spence, John Zelbst, Rex Parris, John Joyce, their family members (without their written consent), unless such family members are faculty, staff, or students of [TLC] on a going forward basis from the date of this agreement, as well as Thunderhead Ranch, beyond factually and historically accurate references to TLC's lease of the Thunderhead Ranch from 1994-2020."   ECF 588 at 2.

6.      The Injunction further provided that "any party hereto that has [sic] alleged to have violated this Agreement [sic] shall have a thirty-day period to cure."   *Id.*

7.      For its part, the Settlement Agreement imposed an affirmative obligation on Defendants to return "all TLC signage, photo albums, TLC memorabilia, TLC signs, Don Clarkson barn sign and plaques in their possession, including the memorial plaques for TLC's observant Jewish alumni."   Mot. to Enforce, Ex. A, ¶ 8.

8.      The Settlement Agreement did not include a cure period, an incorporation clause, or the standard contractual provision that the Agreement supersedes any prior agreements or understandings.   Nor did it contain an attorney's fee provision in the event that the Agreement spawned future litigation.

## A.      ALLEGED VIOLATION OF INJUNCTION RELATED TO SOCIAL MEDIA

9.      Immediately after the Injunction was filed and the case was dismissed, TLC endeavored to sanitize its social media of any materials that it had agreed (and been enjoined) to remove.   This effort began in October 2022 and ostensibly culminated with its counsel's letter on November 15, 2022 to Defendants' counsel advising that all offending material had been deleted from TLC's social media.   *See* ECF 598-1.

10.      TLC's sanitization effort proved incomplete, however, as Defendants identified additional offending material on TLC's Facebook page in both March and June 2023.   *See* ECF

606-1, Ex. A.   Each time, then-TLC President Sloan promised Defendant Zelbst that the offending material would be promptly removed and then took steps to ensure that it was.

11.     The parties dropped the social media issue from June 2023 until October 2024. That sixteen-month ceasefire ended abruptly, however, when TLC's lead counsel wrote to Defendants' counsel about an entirely separate and unrelated issue – the extant obligation on Defendants' part to return certain items of physical property. ECF 599, Pl.'s Resp. to Mot. for Contempt, Ex. A (Oct. 14, 2024 email from Chris Ralston to Steve Velkei).   Entitled "TLC v. Spence – settlement agreement," the email advised that Ralston had prepared "a motion to enforce settlement agreement (with a request for attorney's fees, and costs)," but was hoping to avoid doing so by working through counsel.   *Id*. at 2.   Velkei responded the same day and vowed to follow up with Ralston.   *Id.*

12.     Ralston's email triggered a vigorous and unexpected response from Beth Kushner, another of Defendants' counsel.   Although the issue TLC raised dealt with the return of personal property as stipulated in the *Settlement Agreement*, Kushner undertook her own search of TLC's Facebook page and X/Twitter account to determine whether TLC was in compliance with the *Injunction*.

13.     Kushner conceded that her review of TLC's social media was prompted by Ralston's email to Velkei.   *See* ECF 598, Decl. of Beth Kushner in Supp. of Mot. for Contempt, ¶ 7 ("Mr. Ralston's email was surprising.   I *therefore began* to look at TLC's social media and saw that...TLC had never stopped posting the names, images, or likenesses of the individual defendants, their family members, or Thunderhead Ranch.   I began to advise Mr. Ralston of the violation, because the permanent injunction has a 30-day cure period.") (emphasis added).   *See also* Tr. at 150:4-10; 154:18-155:2.

14.    The Court finds that the Motion for Contempt would not have been filed but for TLC counsel threatening litigation over the personal property provision of the Settlement Agreement.   The Court further finds that Kushner would not have searched through TLC's social media had TLC's counsel not first raised the property issue.

15.    Beginning October 16, 2024, Kushner sent TLC's counsel at least seven letters and two emails, each demanding to one extent or another that TLC sanitize from its social media various kinds of offending material that she had discovered were still featured on it.  *See* ECF 598-2 through 598-8.

16.    In the first letter, dated October 16, 2024, Kushner alleged that her "clients have a basis to seek judicial relief for TLC's repeated, material, long term violations of the permanent injunction."   ECF 598-2 at 2. In a letter the next day, she demanded action: "TLC will need to immediately delete from its social media (and anywhere else) any photographs that show any of the Defendants, their family members, or any portion of the Ranch (grounds or buildings)."   ECF 598-3 at 3.   In a third letter one day later, Kushner identified a long list of videos and photo albums on TLC's Facebook page that in her view violated the Injunction.   ECF 598-4 *passim*. Over the course of the next 30 days, Kushner sent four more letters and two additional emails to supplement her allegation that TLC was in violation of the Injunction.

17.    TLC's counsel did not respond in any way to any of these overtures. Consequently, on November 15, 2024, the 30th day after the first letter was sent to TLC, Defendants filed the Motion for Contempt.   ECF 597.

18.    As of the date on which the Motion for Contempt was filed, Defendants had identified 183 photographs then existing on TLC's Facebook page and X/Twitter account that allegedly contained material barred by the Injunction.  *See* ECF 598, Decl. of Beth Kushner in

Supp. of Mot. for Contempt, ¶ 23.  Defendants also identified four videos then still posted on TLC's Facebook page that violated the Injunction in one way or another.  *Id*. ¶ 25.

19.    At the time the Motion for Contempt was filed, TLC's X/Twitter account also featured numerous banned images.  *See* ECF 598-7 (Oct. 26, 2024 email from Kushner to Ralston) ("I have now reviewed your client's account on X.  I have found over 90 posts of Thunderhead Ranch – photos taken there, images of the Ranch (and, in particular, the iconic barn), and the name "Thunderhead Ranch" in conjunction with "Trial Lawyers College."   Included in that number are photos of Clay and John Zelbst, Rex Parris, and Gerry Spence – virtually all identified by name.").

20.    TLC has never contested that the images and videos complained of by Defendants in fact appeared on its Facebook page and X/Twitter account at the time the Motion for Contempt was filed.

21.    Sometime after the Motion for Contempt was filed, TLC resumed in earnest its effort to sanitize its Facebook page of offending images.  President Chaloupka, Director Sloan, TLC's Executive Director Becky Barlow, and even one of TLC counsel's paralegals have participated in the effort.

22.    Despite this effort, even as of the date of the evidentiary hearing, TLC's Facebook page continued to feature photographs that included content banned by the Injunction. Although it would be almost a fool's errand to try to list every photograph or video that should have been deleted, the Court finds that the list of materials identified in paragraphs 36-39 on pages 35-38 of the joint submission (ECF 616) to be a fair summary of the offending materials.

23.    The photographs and videos that Defendants identified on TLC's Facebook page and X/Twitter account were *not* "factually and historically accurate references to TLC's lease of Thunderhead Ranch from 1994-2020," as that language appears in the Injunction.

24.     Although the Court finds that the images and videos complained of in the Motion for Contempt violated the Injunction – a question the Court considers *not* a close one – the Court does not find the violations to have been willful, knowing, flagrant, or in bad faith.

25.     Per the parties' stipulation, the Court finds that none of the offending photos or videos were posted *after* the execution of the Settlement Agreement and the entry of the Injunction.

26.     The Court finds TLC's renewed social media hygiene effort in late 2024 to have been undertaken in good faith, even though it did not achieve 100% compliance prior to the evidentiary hearing.   The Court further finds, however, that the effort was prompted *only* by the filing of the Motion for Contempt and would not have occurred but for the Motion.

27.     Until the evidentiary hearing, the Court had received no evidence that TLC had made any effort to sanitize its X/Twitter account.   Indeed, until the evidentiary hearing, its current president did not even know that TLC *had* such an account.   *See* Tr. at 93:12-15.[4]

28.     The Court received no evidence that TLC is violating the Injunction through any social medium other than Facebook and X/Twitter (*i.e.*, YouTube, Instagram, LinkedIn, TikTok, etc.).   The scope of this Report and Recommendation, therefore, is limited only to TLC's Facebook page and X/Twitter account.

## B.     ALLEGED VIOLATION OF SETTLEMENT AGREEMENT RELATED TO RETURN OF PROPERTY

29.     The Settlement Agreement imposed an affirmative obligation on Defendants to return "all TLC signage, photo albums, TLC memorabilia, TLC signs, Don Clarkson barn sign and plaques in their possession, including the memorial plaques for TLC's observant Jewish alumni." Mot. to Enforce, Ex. A, ¶ 8.   The provision did not include a date of compliance or address how

---

[4]  The Court notes that TLC's counsel proffered during the argument portion at the end of the hearing that his paralegal had been able to access the X/Twitter account and remove at least some of the offending images.   Tr. at 113:1-5.

the expense associated with the return of the specified property would be paid.

30.    Outside the four corners of the Settlement Agreement itself, the parties unofficially agreed that their respective Presidents, John Sloan for TLC and John Zelbst for GSM, would handle details associated with finalizing the settlement, including coordinating the return of the property.  *See, e.g.*, ECF 607-1, Zelbst Decl. in Supp. of Defs.' Opp. to Mot. to Enforce Settlement ("Zelbst Decl."), ¶ 1 ("After this litigation settled in October 2022, I was responsible for working with John Sloan, President of TLC, to finalize the settlement.   One aspect of that was to deal with certain property."); Tr. at 57 (Zelbst testifying "[t]hat was a pretty loose settlement agreement. John [Sloan] and I were going to work out the details of it.").   For his part, Sloan confirmed the side arrangement.  *See, e.g.*, Tr. at 116:1-4, 128:4-9.

31.    Soon after the case settled, TLC began its efforts to retrieve the property listed in ¶ 8 of the Settlement Agreement.   In a letter to Defendants' counsel dated October 31, 2022, TLC's counsel inquired as to "[t]he date and method by which the Spence Defendants will return TLC's signage, photo albums, memorabilia, Don Clarkson barn signs, and plaques in their possession, including the memorial plaques for TLC's observant Jewish alumni.   TLC personnel are willing to travel to Thunderhead Ranch to collect TLC's belongings.   Please work with Ken Barbe to provide a date when TLC can retrieve these belongings within the next 45 days."   Defs. Ex. E at 4.   The parties presented no evidence of Defendants' response, if any, to this request. Regardless, TLC's letter did not result in the return of the property.

32.    On February 6, 2023, Sloan emailed Zelbst regarding the return of the memorial plaques mentioned in ¶ 8 of the Settlement Agreement.   *See* ECF 607-2, Ex. A to Zelbst Decl. ("We need to send someone onto the ranch to retrieve the plaques that are a part of the settlement agreement.   I assume Kent [Spence] could meet someone there?").   Zelbst soon responded:

"That's going to be a problem.  Tell us who you want and we can get them for you."  *Id.*  The email conversation soon included Defendant Joseph Low, whose contribution consisted of "No one from TLC will be permitted on the ranch.  Give me a list of names of plaques and I will have them removed at our earliest convenience."  *Id.*

33.    Two days later, Sloan responded to Zelbst and Low by specifying several plaques that needed to be returned and suggesting that they be mailed to TLC Director Maren Chaloupka's law office.  *Id.* at 5-6.    Sloan also expressed: "I frankly don't understand why this has to be difficult.  It is a part of the settlement agreement."  *Id.* at 6.  He added "I know that we want all of the TLC signs back.  At one time I thought that you were going to check on that and let me know where they were."  *Id.*

34.    Zelbst replied: "I will follow up on the location of the TLC sign(s).  The only one that I can think of is the one that was on the highway at the East Fork road [sic].  I don't know if it's still in existence as I explained prior to the settlement.  I will check."  *Id.*

35.    For his part, Low advised:

> I have all of the old signs including the metal sculpture of the logo.
> I will arrange for having a Pod delivered to the ranch.  I will have that Pod(s) loaded with the signs.
> Please provide a shipping address and payment to the Pod company.
> Once it is loaded I will call the Pod company to come pick it up.
> There was a wooden sign that hung from the wood arch at the entrance.  It has a quote on the back from Gerry.  I will not be releasing that.  It has TLC on the front.
> My recommendation is to have it destroyed.

*Id.* at 5.  Sloan did not respond to Low's suggested protocol, *see* Zelbst Decl. ¶ 6, and none of the property was returned.

36.    The property issue went dormant for almost a year.  The dormancy ended on February 2, 2024, when TLC's new President, Maren Chaloupka, sent a letter to Zelbst requesting

the return of memorial plaques for certain TLC alumni and the family members of those who are observant Jews. *See* ECF 607-3, Ex. B to Zelbst Decl. Chaloupka offered to drive to the Ranch from her law office in Scottsbluff, NE, to pick up the plaques. *Id.* In her closing paragraph, Chaloupka wrote: "I am open to your suggestions – and, I am hopeful that you agree that it's time to get this term [of the Settlement Agreement] checked off." *Id.*

37.    A week later, Zelbst responded with his own letter: "One thing that you and I can agree on is that it is time to get all of our outstanding issues resolved. We will be happy to work out a transfer of your requested barn wood plaques, *at TLC expense, conditioned upon TLC returning to us all of the old barn wood flooring that was taken by your former administrator and hauled off in a U-Haul trailer*." *Id.* (emphasis added).

38.    Zelbst's letter predicated Defendants' compliance with ¶ 8 of the Settlement Agreement on two conditions not addressed in the Agreement: (1) which side would bear the expenses associated with the property return, and (2) the return of "old barn wood flooring" that Defendants believe had been spirited away from the ranch by TLC's former Executive Director while the litigation was ongoing. Zelbst conceded at the hearing that the Agreement was silent on payment of costs, Tr. at 61:4-11, and that the return of the barn wood flooring was not a term included in the Agreement. Tr. at 57:12-14, 58:5-15.

39.    Chaloupka did not respond to Zelbst's letter, *see* Zelbst Decl. ¶ 8, and none of the property was returned.

40.    The property issue died down for another eight months, only to be resuscitated by Ralston's email to Velkei on October 14, 2024. ECF 599, Pl.'s Resp. to Mot. for Contempt, Ex. A.

41.    On October 16, 2024, Kushner wrote the first of her letters to TLC's counsel that

addressed various aspects of the simmering disputes between the parties.   With particular respect to the property issue, she requested that TLC provide her with "a specific list of items" that she would then discuss with her client "to see what actually exists and can be made available for pick up."   ECF 607-5 at 3.   She cautioned, however, that "TLC will need to pay storage charges for the past four years…TLC will also be responsible for any packing, shipping, or other costs. Accordingly, I trust your client will determine what, if anything, it truly wants."   *Id.* at 4.

42.    In a letter to Ralston the next day, Kushner wrote that ¶ 8 of the Settlement Agreement does not specify to whom the listed property should be returned.   ECF 607-5 at 7. She suggested that Defendants were construing that provision to require return "to the rightful owner."   *Id.*   Using that interpretation, Kushner demanded that TLC provide

> with specificity (a) who paid for a plaque that wants one, and (b) that person's mailing address.   We will also need a written request from the individual responsible for the plaque that it be returned to him or her.   They will be responsible for shipping costs, although it is acceptable if TLC pays the costs for the recipient(s).
>
> …
>
> The plaques have been stored and will be available for sending to the individual(s) who want them under this procedure.

*Id.*

43.    With respect to the "Don Clarkson barn signs" referenced in ¶ 8 of the Settlement Agreement, she added:

> We will reach out to Mr. Clarkson to see what he wants with respect to the sign because it is his name.   If he directs it to go to TLC and if it can be removed without damaging it or the structure to which it is affixed, we will send it at TLC's expense. I will advise you of his wishes and the feasibility of removal/transportation.

*Id.*

44.    In conclusion, Kushner advised:

> [I]t is insufficient to simply list categories of items and say "send them." That would not be consistent with the permanent injunction or paragraph 8 of the settlement agreement. Accordingly, if there is anything beyond the above materials that you believe is at issue, please provide specifics. We will promptly see if it exists, is not within the "carve out" of the permanent injunction, and can actually be shipped (or picked up) at TLC's expense. We will also want to consider the ownership of each item, so that we can determine the appropriate person or entity to whom it should be "returned."

*Id.* at 8.

45.     Kushner addressed various aspects of the property issue in follow-on correspondence sent October 22, 23, 25, and November 6 and 16, 2024. *Id.* at 17-27.

46.     TLC's counsel responded to *none* of these overtures. Instead, eschewing any attempt to communicate with Kushner to resolve the property dispute without the need for litigation, TLC's counsel simply filed the Motion to Enforce Settlement Agreement on December 3, 2024, eighteen days after Defendants filed their Motion for Contempt.

47.     Defendants have not returned to TLC any of the property specified in ¶ 8 of the Settlement Agreement, though they have offered under certain circumstances to do so. *See* Tr. at 51:7-53:11, 58:20-21. Indeed, even *after* the hearing, Defendants proposed a revised property return protocol, *see* ECF 618, to which TLC did not respond.

48.     At times, witness testimony or exhibits referred to the memorial plaques as not having much in the way of monetary value. Since the obligation imposed on Defendants by ¶ 8 of the Settlement Agreement did not speak in terms of value, the Court finds the issue of value to be irrelevant. *See* Tr. at 71-72 (Court explaining why such testimony was not relevant). Defendants' obligation to return the property they agreed to return operated *irrespective* of the value of the particular property.

49.     Although Defendants have alleged that TLC "abandoned" the personal property by not pursuing its return more expeditiously or consistently, *see* ECF 607 at 7, the Court finds as a

factual matter that TLC did not manifest the knowing and intentional relinquishment of its rights to the property that is the *sine qua non* of abandonment.   To the contrary, TLC has affirmatively though periodically sought the return of the property since shortly after the Settlement Agreement was executed.

50.    Although Defendants have alleged that TLC committed the "first breach" of the Settlement Agreement (by violating the Injunction incorporated by reference therein), *see* ECF 607 at 8-9, the Court instead finds that the parties' breaches were essentially contemporaneous, both originating shortly after the Settlement Agreement was executed and the case was dismissed. The breaches persisted through the filing of the respective motions complaining about them.

51.    The Court finds that Defendants violated ¶ 8 of the Settlement Agreement by not seasonably returning to TLC the specified property and by conditioning its return on the surrender of other property not contemplated in the Settlement Agreement.

## PROPOSED CONCLUSIONS OF LAW

### A.    MOTION FOR CONTEMPT

1.    Under *FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004), a party seeking a finding of civil contempt must show by clear and convincing evidence that (1) a valid judicial order existed, (2) the allegedly offending party had knowledge of the order, and (3) the party disobeyed the order. *Id*. at 756-67. If the movant makes that showing, the burden shifts to the party resisting the motion to show either (a) substantial compliance with the order or (b) inability to comply with it.   *Bad Ass Coffee Co. of Haw., Inc. v. Bad Ass Coffee Ltd. P'ship*, 95 F. Supp.2d 1252, 1255 (D. Utah 2000). The parties agree on this burden-shifting framework.   *Compare* ECF 597 at 7 (motion), *with* ECF 599 at 4-5[5] (response).

---

[5] The Court refers to the page numbers generated by CM/ECF rather than the numbers on the document itself.

2.     TLC does not contest the validity of the Injunction or its own knowledge of it. TLC challenges only whether it violated the Injunction's prohibition on using banned content on its social media.

3.     TLC makes three principal arguments as to why it did not violate the Injunction. First, it contends that "the spirit and purpose of the Permanent Injunction [were] to prevent the use of Defendants' name, image, or likeness on a *going forward basis*, which TLC has more than substantially complied with."  ECF 599 at 4 (emphasis added).  TLC next asserts that the social media posts in question "fall squarely within the Injunction's exception that allows for 'factually and historically accurate references to TLC's lease of Thunderhead Ranch from 1994-2020.'" ECF 599 at 2.  TLC's final argument is that Defendants did not comply with the 30-day cure period required by the Injunction.  *Id.*  The Court examines the arguments *seriatim*.

4.     TLC insists that it has not violated the Injunction because "[e]very single social media post complained of by Defendants was posted *before* the Permanent Injunction."  *Id*. at 5 (emphasis added).  TLC apparently reads the Injunction to freeze and immunize its social media footprint as it existed at the moment the Injunction was filed, forbidding only *newly added posts* of content banned by the Injunction.  In other words, TLC's view is that every photograph, video, message, and other expression that existed on its social media footprint at the moment the presiding judge filed the Consent Injunction could remain there permanently.

5.     The Court rejects this argument because such a cramped construction inflicts violence on the plain meaning of the language in the Injunction.  The relevant language enjoins TLC "from using" certain categories of material.  ECF 588 at 2.  The language forbids "using" – it does not include any limitation or restriction on *when* the offending material must have been created or first posted.   Indeed, it would be perverse for Defendants to have agreed that TLC could

continue to feature their names, images, or likenesses, or photos of Thunderhead Ranch so long as TLC was doing so immediately prior to the entry of the Injunction.   Instead, the plain language of the Injunction necessarily contemplated that TLC would do two things: (1) remove from its social media any content containing material banned by the Injunction, *and* (2) refrain from posting or re-posting any such content in the future.   To do otherwise – to continue to feature the banned material – would be *to continue using* it.   And that is precisely what the Injunction forbade.

6.    To be sure, the Injunction makes reference to "a going forward basis[.]" Specifically, the Injunction enjoined TLC "from using the name, image, or likeness of [Defendants], their family members (without their written consent), unless such family members are faculty, staff, or students of the Trial Lawyers College *on a going forward basis from the date of this agreement*, as well as Thunderhead Ranch, beyond factually and historically accurate references to TLC's lease of the Thunderhead Ranch from 1994-2020."   *Id*. at 2 (emphasis added).   Read in context, however, the italicized language applies only to any family member of any Defendant who is a faculty or staff member or student of TLC *after* the date of entry of the Injunction.   The "going forward" language is no broader than that.   If TLC had truly desired a broader construction, it should have insisted on different language.

7.    As to TLC's argument that the content in question is nothing more than "factually and historically accurate references to TLC's lease of the Thunderhead Ranch from 1994-2020," the Court takes a decidedly different view.   An objective reader of that language would understand it to authorize TLC to state, represent, and even publish that – as a matter of historical fact – TLC was headquartered on, and the leasehold tenant of, Thunderhead Ranch in or near Dubois, Wyoming, from 1994-2020.   But the excerpted language permits little more.   To suggest that this exception is elastic enough to also authorize the display of photos and videos of the founder, certain

prominent faculty members, or depictions of various curricular settings would wrench the language

way past its breaking point, not to mention common sense.

8.      TLC's own conduct since the entry of the Injunction further supports the Court's

interpretation of the language in question.   Albeit in fits and starts, TLC has undertaken to sanitize

its social media of the content banned by the Injunction, *no matter when* it was created or posted.

It did so in October and November 2022, again in March and June 2023, once again in December

2024 (in direct response to the filing of the Motion for Contempt), and continued to do so even after

the hearing in this case.   *See* ECF 621, Pl.'s Notice of Updates Occurring Since Jan. 10, 2025 Hrg.

(explaining ongoing efforts to remove disputed content).   The Court notes that TLC has never

asked the presiding judge for clarification of the scope or interpretation of the Injunction's language

to which TLC itself agreed.   The Court further notes that TLC's current and immediate past

presidents professed no doubt about what they understood TLC's obligation to be in this regard.

*See* Tr. at 73:23-74:6 (Chaloupka directing removal of images "in recognition of what I understood

to be the terms of the settlement."); Tr. at 116:14-28 (Sloan explaining that if Zelbst notified him

of offending content, "I turned right around and called [TLC's Executive Director] and said, 'I've

had a complaint.   Get on Facebook, or wherever, and get them down,' because that's what we're

required to do.").

9.      TLC's final fallback position is that Defendants failed to comply with the 30-day

cure provision in the Injunction.   That argument, too, is well wide of the mark.   Consistent with

Findings of Fact 15-17, *supra*, the Court concludes that Defendants complied with the cure period.

In the light *least* favorable to Defendants, their letter to TLC's counsel on October 16, 2024, opened

the cure period. In that letter, Defendants' counsel alleged that her "clients have a basis to seek

judicial relief for TLC's repeated, material, long term violations of the permanent injunction."

ECF 598-2 at 2. In a letter the next day, Defendants' counsel demanded action: "TLC will need to immediately delete from its social media (and anywhere else) any photographs that show any of the Defendants, their family members, or any portion of the Ranch (grounds or buildings)."  ECF 598-3 at 3.   In a third letter all of one day later, Defendants' counsel identified a long list of videos and photo albums posted on TLC's Facebook page that in her view violated the Injunction.   ECF 598-4 *passim*. Over the course of the next 30 days, Defendants' counsel sent four more letters and two additional emails to supplement the allegation that TLC was in violation of the Injunction.   On the 30th day after sending the first letter – and after receiving no response whatsoever from TLC's counsel to any of these overtures – Defendants filed the Motion for Contempt.

10.    The Court finds and concludes that this sequence complied with the letter and spirit of the Injunction's cure provision.   The Court further concludes that TLC has offered no persuasive legal support for its theory that Defendants restarted the 30-day clock with each of their letters.   In addition, given that TLC remained in violation of the social media portion of the Injunction even while the hearing was occurring, its complaints about Defendants' compliance with the cure period seem quite beside the point.

11.    Based on the foregoing analysis, the Court concludes that Defendants demonstrated by clear and convincing evidence that TLC violated the Injunction by not timely and completely sanitizing its Facebook page and X/Twitter account of content the plain language of the Injunction forbade, including content containing the names, images, or likenesses of Defendants, their family members, and/or Thunderhead Ranch.   This is true even though, in the wake of the Motion for Contempt, TLC undertook a concerted and good faith effort to delete any offending material. Despite its good faith, TLC remained in violation of that portion of the Injunction even through the date of the evidentiary hearing.

12.    Accordingly, the burden shifts to TLC to demonstrate either substantial compliance or inability to comply with the Injunction.   TLC does not argue that its post-settlement efforts to sanitize its social media of offending content achieved substantial compliance.   The Court received no evidence, for example, of what percentage of TLC's Facebook and X/Twitter content the offending content comprised.   Were these 200 photographs out of 2,000, 20,000, or some other number altogether?   The Court simply does not know whether the offending content represented a significant or an infinitesimal percentage of TLC's overall content.   Consequently, the Court has no occasion to address the percentage of content purity it would require for a finding of "substantial" compliance.

13.    TLC also does not assert that it was unable to comply with the Injunction.   To be sure, it did complain that deleting material from its social media was "unreasonably onerous." ECF 599 at 5.   But then it presented evidence of several people on its behalf doing just that.   And it continued its efforts even after the hearing.   The Court thus concludes that TLC has not carried its burden to show an inability to comply with the social media portion of the Injunction.

**B.    MOTION TO ENFORCE SETTLEMENT AGREEMENT**

14.    Defendants have violated ¶ 8 of the Settlement Agreement by failing to return to TLC the property listed there.   This violation is made most plain by Defendants attaching conditions to the return that do not appear in the Settlement Agreement.   If Defendants had wanted to condition their return of the listed property on TLC's agreement to pay for it – or TLC's agreement to first return the old barn wood – Defendants should have negotiated for those conditions.

15.    To the extent that Defendants argue that the Settlement Agreement did not prescribe a date by which the property must be returned or to whom it should be returned, the Court

concludes that neither quibble excuses Defendants' violation.   The objective reader of ¶ 8 would understand that Defendants were agreeing to return the property *to TLC* and to do so at a reasonable time.   The objective reader would understand that ¶ 8 imposed on Defendants the obligation to affirmatively identify the listed property wherever it might reasonably be located and then ship it *en masse* to the law office of TLC's President.   The objective reader certainly would *not* read ¶ 8 to permit Defendants to play semantic games with a contractual term they agreed to such that they ultimately are relieved of returning anything to anyone.

16.    Defendants' violation of the Settlement Agreement is ameliorated by their repeated offers (albeit on their own terms) to do so since February 2023.   Consequently, the Court does not find Defendants' violation to be intentional, willful, flagrant, or in bad faith.

## PROPOSED REMEDIES

The first sentence of the Injunction provides that it "shall remain in effect until further Order of the Court."   ECF 588 at 1.   This sentence demonstrates that the parties anticipated that the Court may need to involve itself in the administration of the Injunction and/or the Settlement Agreement that incorporated the Injunction.   Resolving the instant motions is a prime example of when such a supplemental order is appropriate.

## A.    PROPOSED REMEDY FOR VIOLATION OF INJUNCTION

The Court recommends that no monetary damages be awarded to Defendants. By mid-October 2024, neither side appeared to be seriously engaged any longer in policing their adversary's compliance with the Settlement Agreement or the Injunction.   By all objective appearances, the two sides had disarmed, disengaged, and moved on.   Indeed, it was not until Ralston's letter to Velkei inquiring about the memorial plaques that Kushner renewed her interest in TLC's Facebook page and Twitter feed, which the Court has found would not have happened

but for Ralston's letter.   Though it was sufficient to prove a technical violation of the Injunction, the evidentiary record does not support allowing Defendants to convert these events into a monetary windfall.   Defendants fell substantially short of convincing the Court that damages are necessary either to compensate them for some sort of injury or to deter future recidivism by TLC. Indeed, Defendants presented no evidence that the courses they now provide under the auspices of the Gerry Spence Method have lost even a single registrant due to TLC's violation of the Injunction.   Nor did Defendants present evidence that TLC itself benefited – either by registration, revenue, recruitment, or otherwise – from its violation.

The Court instead believes that the appropriate remedy for TLC's violation should be purely injunctive in nature. In the joint submission filed before the evidentiary hearing, Defendants identified 36 categories of content that *still* appeared on TLC's Facebook page and X/Twitter account that the Injunction required TLC to remove.   *See* ECF 616 (paragraphs 36-39 on pages 35-38).   TLC did not dispute any of the categories nor show that the list was too long or the task too difficult.   This Court therefore recommends that the presiding judge order TLC to sanitize its Facebook page and X/Twitter account of any remaining content banned by the Injunction, including but not limited to those 36 categories.   This Court further recommends that the presiding judge order TLC to complete this task within 60 days of the entry of the order and file a notice of compliance when it has done so.[6]

## B.    PROPOSED REMEDY FOR VIOLATION OF SETTLEMENT AGREEMENT

To resolve the current dispute and to forestall any future dispute over any other property

---

[6] The Court is aware of – and commends – TLC's efforts to continue sanitizing its social media after the hearing. *See* ECF 621, Pl.'s Notice of Updates Occurring Since Hrg., filed Jan. 24, 2025.   It may well be that TLC has already (and at long last) cured its lack of compliance with the Injunction and thereby protected itself against a future allegation of recidivist conduct.   The supplemental order recommended here may thus require little additional effort on TLC's part.

covered by ¶ 8, this Court recommends that the presiding judge order Defendants to ship – *en masse* – all property in their possession identified in ¶ 8 of the Settlement Agreement to TLC President Maren Chaloupka at 1906 Broadway, Scottsbluff, NE 69363.[7]   Specifically *excluded* from this property transfer obligation are any plaques bearing the names of Defendants or their family members.   This Court further recommends that Defendants' compliance deadline be no later than 60 days after the presiding judge issues his order resolving any objections to this Recommendation.   This Court further recommends that the presiding judge order Defendants to file a notice of compliance when they have effectuated the shipment.   The presiding judge may wish to consider granting the parties discretion to agree to other arrangements *so long as all of* the property contemplated in ¶ 8 is transferred no later than the 60-day compliance deadline.   Finally, since the Settlement Agreement is silent as to which party should pay for the shipping, this Court recommends that the presiding judge order the parties to share the cost equally.

## COMPETING REQUESTS FOR ATTORNEY'S FEES AND COSTS

In their respective motions, each side requested an award of attorney's fees.   *See* ECF 597 at 3, 10; ECF 603 at 1, 4.   At the hearing, the Court directed counsel to submit fee requests with supporting documentation.   Tr. at 191-92.   Each side complied and requested fairly comparable amounts.   *See* ECFs 620 (TLC requesting $24,325.00); 622 (Defendants requesting $20,904.00).   In addition, Defendants filed objections [ECF 623] to TLC's request and TLC responded to the objections.   ECF 627.

In circumstances like those now before it, the Court has wide discretion to grant all, part, or none of a party's request that its attorney's fees be reimbursed by its legal adversary. *See Mares*

---

[7] Among the property that Defendants agreed to return were "TLC signage," "TLC signs," and the "Don Clarkson barn sign."   Sett. Agrmt. ¶ 8.   This Court understands this category of property to include, but not necessarily be limited to, the four signs at issue in the Preliminary Injunction issued in June 2020.   *See* ECF 46 at 15-16.

*v. Credit Bureau of Raton*, 801 F.2d 1197, 1200–01 (10th Cir. 1986).   For the following reasons, the Court is of the ironclad impression that neither side should be ordered to pay any portion of the other's fees.

## A.     DEFENDANTS' REQUEST

The Court begins with Defendants' request, which came first in time.   The single-most important reason that counsels the Court against recommending this award of fees is that Defendants *never would have filed* their Motion for Contempt had Ralston not emailed Velkei in October 2024 about the unrelated issue of memorial plaques.   To her credit, Kushner admitted that Ralston's email was the impetus for her to reexamine TLC's Facebook and X/Twitter footprint.   So far as the Court was made aware, however, no one else – certainly no Defendant and none of their counsel – was still policing TLC's social media for compliance with the Injunction.   Nor had they been for the previous sixteen months.   Thus, the Motion for Contempt arose from the mere serendipitous happenstance of Defendants' nemesis jabbing their collective ribs on an unrelated issue.   That Defendants then cobbled together a factual basis to support a contempt motion, filed it as soon as the cure period permitted, and thereby won the proverbial race-to-the-courthouse is a sequence this Court believes to be unworthy of an award of fees.   To the objective outsider, the Motion for Contempt appears to have been *both* a preemptive strike in a game of litigation tit-for-tat *and* much ado about not very much.

Tempering the Court's disappointment that Defendants ever filed the Motion for Contempt at all, however, is the inexcusable conduct of TLC's counsel in willfully failing to respond to – much less meaningfully engage with – defense counsel on the social media issue.   This Court is still *stunned* at TLC's counsel's refusal to respond to any of the letters or emails that Kushner sent from October 16, 2024 until November 15, 2024 when she filed the motion.   At least nine separate

times, Kushner expressed her interest in conferring on the social media issue (and often also on the property issue) only to be stiff-armed by TLC's counsel every time.   Going radio silent on one's opposing counsel like this is unprecedented in this Court's experience. And the Court fully accepts Kushner's avowal at the hearing that she would have held off on filing the motion had TLC's counsel meaningfully engaged with her.   *See* Tr. at 156:19-23, 157:23-158:8.[8]

Even after filing the Motion for Contempt, Kushner continued to attempt to engage TLC's counsel on the subjects at issue in the two motions now pending before the Court.   To that end, she sent correspondence to TLC's counsel on November 16th (the day after filing the Motion for Contempt) and twice on November 26th.   TLC's counsel did not respond in any way.   Indeed, TLC's counsel did not respond to Kushner at all until December 23, 2024.   Although TLC's counsel hinted during the hearing that his law partner, Lindsay Calhoun, had earlier responded to Kushner (*see* Tr. at 162:20-163:22), the Court finds to the contrary.   At no point before, during, or after the evidentiary hearing did TLC's counsel offer any documentary evidence showing *any* attempt to correspond with Defendants' counsel between October 16, 2024 and December 23, 2024.   TLC's fee request also reflects no entry showing any time spent preparing a response to Kushner until December 23rd.   *See* ECF 620-1 at 2-6.   The Court specifically accepts Kushner's representation that she was not contacted by Ms. Calhoun during that period.   Tr. at 188:19-189:4.

TLC counsel's refusal to engage with Kushner extended even to her efforts to comply with an order of this Court.   In its order rescheduling the evidentiary hearing to January 10, 2025, the Court specifically directed the parties – by noon on January 7th – to "file a joint statement

---

[8] From TLC's fee request, the Court can see that its counsel were certainly discussing Kushner's correspondence to them and even "strategizing" about it.   ECF 620-1 at 2-4.   That they opted against responding so much as a single time left her with few options besides seeking judicial intervention.   Whether their decision to ignore her ultimately worked out in TLC's best interest is a question for another day.

indicating whether and in what ways they have been able to narrow the issues in dispute."  ECF 609 at 2.  On Defendants' behalf, Kushner immediately sought to comply by writing to TLC's counsel yet again, setting forth her views on the scope of the pending issues and inviting dialogue. *See* ECF 612 at 2.  A few days later, she circulated a proposed set of stipulated facts for TLC's consideration.  *Id.*  For their part, however, TLC's counsel waited until December 23, 2024, to respond at all and did so only to acknowledge receipt of the proposed stipulation and to promise that they would respond "in due course."  *Id.*  In recognition of TLC's renewed effort to sanitize its Facebook page, Kushner circulated a revised proposed stipulation of facts on December 30, 2024, requesting feedback.  Hearing nothing from TLC's counsel, however, she filed a "Notice of Efforts to Comply," advising the Court of her efforts to comply with the Court's directive and how they had been essentially stymied by TLC's failure to meaningfully engage.  *Id.* at 2-3.

At 4:58 p.m. on the evening before the Court's noon deadline – 25 *days* after the Court's order directing joint action and two full weeks after promising to respond – TLC's counsel *finally* provided a substantive response to Kushner's proposed revised stipulation.  *See* ECF 616 at 41. This belated overture yielded a frenzy of proposals bouncing back and forth in the last 19 hours of what had been a nearly *four-week* compliance window.  Ultimately, but not surprisingly, the parties were unable to reach agreement on any material fact or legal issue that would assist the Court in sharpening its focus.  *See id.* at 1.  Instead, they agreed to simply file a 126-page compendium of their competing drafts, which proved of little use to the Court.  The filing did make plain, however, that the parties continue to quarrel with each other to such an extent that only a third party – here, the Court – can bring an end to it.

The Court assigns to TLC the lion's share of responsibility for the parties' inability to meaningfully comply with its order.  It is difficult for the Court to express its disappointment in

the manner in which TLC's counsel chose to engage (or not) with Defendants' counsel beginning October 16, 2024, and continuing through to the hearing. TLC counsel's performance in that regard has fallen well short of the standard the Court expects from sophisticated federal litigators. Walking one's client into the equivalent of a contempt finding by stubbornly refusing to engage with opposing counsel is an approach that counsel would do well to abandon.

In the end, though the conduct of TLC's counsel came close to convincing the Court otherwise, the Court finds and concludes that the interests of justice do not require ordering TLC or its counsel to pay all or part of Defendants' attorney's fees. The Court considers its profound disapproval expressed here to be a sufficient sanction.

## B.    TLC'S REQUEST

The Court will not tarry long with TLC's fee request. TLC does not identify any statutory or contractual authority that would support the award of fees in the context of its Motion to Enforce.[9] *See Poulston v. Evanston Clinic Corp.,* No. 12-CV-150-J, 2014 WL 11515823, at *1 (D. Wyo. Feb. 4, 2014) (explaining that "Wyoming adheres to the American rule, that is, attorney's fees are recoverable only if there is a contract or statute authorizing recovery of attorney's fees") (citation omitted). Nor did TLC comply with Local Rule 7.1(b)(1)(A) requiring pre-filing conferral. For months, TLC ignored its opposing counsel, in violation of norms expected of experienced federal litigators. TLC shunned the various protocols offered by Defendants or their counsel related to return of property. TLC did precious little to narrow the issues or factual disputes presented by these motions. Though TLC prevailed on its Motion to Enforce, it deserves nothing besides the prompt return of property as recommended here. This Court recommends the

---

[9] Even if TLC *had* offered a lawful basis that theoretically authorized it an award of fees, the Court would not recommend the presiding judge exercise his discretion to do so for the reasons set forth above.

presiding judge deny in its entirety TLC's request for fees.

## CONCLUSION

**IT IS THEREFORE RECOMMENDED** that the presiding judge: (1) **GRANT** Defendants' Motion for Contempt to the extent that it requests (i) a finding that TLC has violated the Injunction and (ii) an order that TLC sanitize its Facebook page and Twitter/X account of content barred by the Injunction; (2) **DENY** the Motion for Contempt to the extent that it requests the award of compensatory damages; (3) **GRANT** TLC's Motion to Enforce to the extent that it requests (i) a finding that Defendants have violated the Settlement Agreement by not timely returning to TLC the personal property referenced in ¶ 8 of the Agreement and (ii) an order compelling Defendants to return to TLC the property in question; and (4) **DENY** the parties' competing requests for attorney's fees.

**IT IS FURTHER RECOMMENDED** that any other relief requested by either motion be **DENIED**.

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE NOTIFIED THAT** pursuant to Local Civil Rule 74.1(b) of the Local Civil Rules for the United States District Court for the District of Wyoming:

A party may object to a Magistrate Judge's proposed findings and recommendations on any matter referred pursuant to 28 U.S.C. § 636(b)(1)(B) within fourteen (14) days after service of the Magistrate Judge's proposed findings and recommendations. Any objections shall specifically identify the portions of the proposed findings and recommendations to which objections are made and the basis for such objections. The District Judge assigned to the case will conduct a de novo review of the objections in accordance with 28 U.S.C. § 636(b)(1). Any objections, response thereto and reply, if any, shall be subject to the page limitations imposed on dispositive matters under Local Rule 7.1(b)(2)(B) and (C).

Any party objecting to the above proposed findings and recommendations shall comply with the Local Civil Rules and 28 U.S.C. § 636(b)(1) accordingly.